UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                                              CASE NO. 8:23-cr-246-KKM-SPF

SALEH YUSUF SALEH

## UNITED STATES' SENTENCING MEMORANDUM

The United States recommends that the Court sentence Saleh Yusuf Saleh to a term of imprisonment of 87 months, with credit for time served and both counts to run concurrently, based on full consideration of the United States Sentencing Guidelines and an anticipated motion from the United States for a downward departure. The Court should deny a downward variance.

### Factual Background

The defendant was involved in a conspiracy to distribute firearms to purported Mexican cartel members. According to the plea agreement and the final pre-sentence report, the following facts are not in dispute. Docs. 45, 72:

From an unknown date through on or about March 3, 2023, the defendant, Saleh Yusuf Saleh (SALEH), was part of a conspiracy to transfer firearms to commit a felony or drug trafficking crime. It was reasonably foreseeable to SALEH that members of the conspiracy would commit additional crimes to further the conspiracy's purpose – specifically, the concealment of funds obtained from the

illegal transfer of firearms to undercover law enforcement agents believing those funds to be the proceeds of drug trafficking.

    A.    **Trafficking of Firearms**

From at least in or about August 2021, up to and including on or about March 2, 2023, SALEH conspired with Yuendry Rodriguez Hilario (Rodriguez) and others to sell firearms to purchasers purported to be associated with a drug cartel in Mexico; in reality, the purchasers were undercover ATF agents (UC-1, UC-2, and UC-3). SALEH and others known and unknown to the United States Attorney believed that the purchasers of these firearms intended to smuggle the firearms into Mexico and Florida for utilization by cartel members in furtherance of drug trafficking. SALEH further believed that firearms the conspiracy distributed would have serial numbers removed when sent to Mexico so as to not be traceable to members of the conspiracy.

Rodriguez negotiated the sale of firearms in the Middle District of Florida and elsewhere with others known and unknown to the United States Attorney. During the course of and in furtherance of the conspiracy, SALEH supplied for sale to the undercover agents a machinegun as defined under 26 U.S.C. § 5845(b) and a silencer as defined under 18 U.S.C. § 921(a)(25).

SALEH was the source of supply of firearms that Rodriguez and others distributed during the course of the conspiracy. SALEH obtained firearms through legitimate firearms dealers by purchasing the parts – stripped lower receivers, lower receiver parts kits, and upper receivers – and then assembling the firearms himself.

By doing so, SALEH was able to purchase firearms for approximately $300 each, then sell them at 2-3 times the purchase price.

SALEH conspired to purchase, assemble, and illegally transfer firearms to coconspirators and the undercover agents on at least the following occasions:

- The sale of ten firearms at a price of $16,000 on October 21, 2021, by Coconspirator 1 to undercover agents;
- The sale of ten firearms to undercover agents in Cleveland, OH with Rodriguez on March 10, 2022;
- The sale of thirty firearms, to include a machinegun and silencer, to undercover agents in Cleveland, OH with Rodriguez at a price of $28,500 on May 26, 2022; and
- The sale of forty firearms to undercover agents in Cleveland, OH with Rodriguez, on March 2, 2023.

SALEH was arrested during the planned sale of forty firearms to agents on March 2, 2023. Following his arrest, federal agents advised SALEH of his *Miranda* rights and SALEH agreed to speak to agents. During a post-*Miranda* interview, SALEH admitted to meeting Rodriguez on an online firearms forum and sold him firearms. SALEH further admitted to directly selling or attempting to sell a combined eighty firearms to undercover agents on three occasions.

### B. Concealment of Proceeds Represented To Be From a Specified Unlawful Activity (Count Two)

During the course of the conspiracy, and while SALEH was a member of the conspiracy, a coconspirator deposited the proceeds from the illegal transfer of firearms in the bank account of another coconspirator to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of a specified unlawful activity – specifically, drug trafficking. On October 21, 2021, Coconspirator 1 sold ten rifles to UC-1 and UC-2 in St. Petersburg, within the Middle District of Florida, in exchange for $16,000. Following this sale, agents followed Coconspirator 1 as he drove to an area bank. Coconspirator 1 entered the drive-through of this bank and made an ATM cash deposit of $9,000 into the bank account of Coconspirator 2, who was the only signatory to that account. At the time this transaction was conducted, it was represented to the conspirators that UC-1 and UC-2 were members of a Mexican drug cartel and that the illegal transfer of firearms to the UCs would further the illegal objectives of this drug cartel. It was therefore known and reasonably believed by the members of the conspiracy that the funds utilized in the purchase of the firearms were the proceeds of drug trafficking, a specified unlawful activity.

### Pre-Sentence Report

Saleh's base offense level for the § 924(o) conspiracy is 18. Doc. 72 at 9; 26 USSG § 2K2.1(a)(5). There is a six-level enhancement for the amount of firearms involved in the offense; a four-level enhancement for the trafficking of firearms; and

a four-level enhancement for knowing that the firearms were intended to be used in the commission of a felony offense. Doc. 72 at 9-10.

Saleh also pleaded guilty to money laundering. Based on USSG § 2S1.1(a)(1), Probation recommended applying a base offense level of 32, which is the offense level for Count One after incorporating the relevant sentencing enhancements. There is a two-level increase for convictions under § 1956. *Id*. at 10. After acceptance of responsibility, the total offense level is 31.[1]

The lone objection to Probation's application of the Guidelines is for the two-level enhancement for Saleh's conviction in Count Two. The plain language of § 2S1.1 supports the enhancement and the arguments in opposition are more appropriate as a factor for the Court to consider under 18 U.S.C. § 3553(a).

## Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, sentencing judges should apply the United States Sentencing Guidelines (USSG) in arriving at an appropriate sentence, but application of the USSG is not mandatory. *Booker*, 543 U.S. at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Accordingly, sentencing judges should apply the USSG in determining a reasonable

---

[1] In the related case of Yuendry Rodriguez Hilario, Case No. 8:23-cr-109-WFJ-TGW, he pleaded to a superseding information to three counts: 18 U.S.C. § 924(o), 18 U.S.C. § 924(c), and 18 U.S.C. § 1956. Because Rodriguez Hilario's offense conduct included a § 924(c) offense, his anticipated sentencing recommendation would include a five-year consecutive term of incarceration. Though Saleh's offense conduct could reasonably include a § 924(c) offense, his plea to an information prior to indictment removed this offense.

sentence, but can also exercise discretion in deviating from the USSG, if doing so would result in a reasonable sentence, taking into consideration other factors that Congress has enumerated in 18 U.S.C. § 3553(a).

Section 3553(a) requires that the sentence reflect:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the offense category in the guidelines;

(5) any pertinent policy statement issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Regarding the reasonableness of a USSG sentence, "'when the district court

imposes a sentence within the advisory Guidelines range,'" the Eleventh Circuit "'ordinarily will expect that choice to be a reasonable one.'" *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) (quoting *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005)).

To arrive at an appropriate sentence, the district court must consider all of the applicable Section 3553(a) factors. *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009). That does not mean, however, that it must give all of the Section 3553(a) factors equal weight. Instead, the sentencing court "is permitted to attach 'great weight' to one factor over others." *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 57 (2007)). The decision about how much weight to assign a particular sentencing factor is "committed to the sound discretion of the district court." *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008) (internal citation omitted).

In this case, the Guidelines support a sentence of 87 months, taking into consideration an anticipated motion from the United States for a downward departure. The conduct in this case is egregious, and the Guidelines arguably do not capture the severity of the conduct charged. Whereas a domestic trafficker could face ten years' minimum imprisonment for selling two ounces of pure methamphetamine, the trafficking of almost 100 firearms to a Mexican cartel that would send metric tons of the same substance into the United States carries comparable guideline ranges.

Saleh repeatedly sold firearms built with his own hands to men purporting to be Mexican cartel members. He also sold a machinegun to them. These purported cartel members made it clear that firearms would be smuggled to Mexico, including

7

via Florida, and that the serial numbers would be obliterated so they could not be traced back to Saleh and others. Saleh further told one of these men that he was thinking of building "ghost guns" (untraceable firearms). A purported cartel member even told a member of the conspiracy that his associates in Mexico needed more guns because they were "battling and losing," all but confirming that the guns were needed to kill rivals in Mexico.

For the sake of the public, these cartel members were undercover ATF agents and Saleh was arrested and charged by criminal complaint after agents seized about 90 firearms, including the 40 firearms Saleh was involved in selling on the day of his arrest. Saleh confessed to law enforcement and admitted to building firearms by ordering constituent parts and building them himself.

Saleh not only obtained firearm components and assembled them, he was also an active participant in sales of firearms to the agents. On March 10, 2022, Saleh participated in the sale of ten of these firearms in Cleveland, Ohio. This sale, like all the other sales described here, were recorded. Saleh told the agents that all of the firearms were brand new and would not be reported stolen. One of the undercover agents said "his people" would scratch off all serial numbers and the firearms would be going to Mexico. Images of those firearms are presented below:



A larger purchase followed on May 26, 2022, in Cleveland. Once again, Saleh was present. While on video, he showed the undercover agents three boxes, each containing ten of the AR-style pistols shown below, and confirmed "I build them all." Saleh further transferred a silencer to the agents and opened a Glock gun case to present to the agents a MAC-11 machinegun. One of the undercover agents examined the gun and Saleh confirmed that it fired in "four-round bursts" with each pull of the trigger. Saleh and coconspirator Yuendry Rodriguez Hilario further confirmed that the gun could be switched between "semi" and "auto" positions, the latter setting being capable of firing more than one round with a single pull of the trigger – meeting the definition of a machinegun under federal law.



Saleh pulling out one of the boxes on May 26, 2022




Firearms purchased on May 26, 2022, from Saleh and Rodriguez Hilario.

On the day of his arrest, Saleh was a participant in the sale of another 40 firearms to the undercover agents. Prior to that, Rodriguez Hilario was in frequent communication with one of the agents. Surveillance units saw Saleh load the rear hatch of his vehicle before leaving his house to go to the meeting location in

10

Cleveland. At the meeting with the undercover agents, Saleh helped Rodriguez Hilario move four boxes, each containing ten firearms, to the undercover vehicle. He later gave one of the agents a small backpack and directed the agent to put the purchase money in the bag. Shortly after that, he and Rodriguez Hilario were arrested.



Saleh at the March 2, 2023 transaction

In sum, Saleh was aware of why he was assembling and selling these firearms. He knew that the firearms were supposed to go to cartel members in Mexico. A reasonable inference was that in the hands of cartel members the firearms would be used to maintain the cartel's territory and status by killing rivals. Rather than be deterred, Saleh continued participating in the sales and even indicated to them that he was going to build guns that were untraceable to law enforcement. He did not just

11

abet what he could reasonably infer to be murder, but suggested making it *easier* with untraceable "ghost guns."

Based on the foregoing, the Court should sentence Saleh to 87 months' imprisonment.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By: /s/ *Daniel Baeza*
Daniel Baeza
Assistant United States Attorney
United States Attorney No. 164
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Daniel.Baeza@usdoj.gov

U.S. v. Saleh                                              Case No. 8:23-cr-246-KKM-SPF

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

    Defense Counsel of Record

                                      */s/ Daniel Baeza*
                                      Daniel Baeza
                                      Assistant United States Attorney
                                      United States Attorney No. 164
                                      400 N. Tampa Street, Suite 3200
                                      Tampa, Florida 33602-4798
                                      Telephone:  (813) 274-6000
                                      Facsimile:  (813) 274-6358
                                      E-mail:        Daniel.Baeza@usdoj.gov